Filed 7/20/22  In re Desmond L. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re DESMOND L., Jr., a Person Coming Under the Juvenile Court Law. | B313494 (Los Angeles County Super. Ct. No. 19CCJP04616) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DESMOND L., Sr., et al., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin Kesler, Juvenile Referee.  Conditionally affirmed and remanded with directions.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Desmond L., Sr.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant Chevette P.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

_____

Chevette P. (Mother) and Desmond L., Sr., (Father) appeal from the juvenile court's order terminating their parental rights over two-year-old Desmond L., Jr., (Desmond) under Welfare and Institutions Code section 366.26.[1]  They contend the juvenile court erred in finding the beneficial parental relationship exception to termination of parental rights did not apply.  The parents also argue the Los Angeles County Department of Children and Family Services (the Department) and the juvenile court failed to comply with the inquiry and notice provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and related California law.

The juvenile court did not abuse its discretion in finding the beneficial parental relationship exception did not apply.  However, we agree the Department and the juvenile court erred in failing to comply with the inquiry and notice provisions, and the error was prejudicial.  We conditionally affirm and remand for the juvenile court and the Department to comply with the inquiry and notice provisions of ICWA and California law.

_____

[1]  Further undesignated statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Referral, Dependency Petition, and Detention*

On July 4, 2019 the Department received a referral after Mother locked herself and one-month-old Desmond in the bedroom. Father called law enforcement "'to get her (Mother) to the mental hospital.'" Father denied Mother had threatened to kill herself or the baby; however, he reported Mother had previously made this threat.[2] Mother was involuntarily hospitalized because she was "'agitated'" and experiencing "'active psychosis'" and "'delusional paranoid thoughts.'" The paternal grandmother (Priscila L.) expressed concern about Mother's failure to take her medication. The paternal grandmother reported she had urged Father to file for custody of Desmond and to move back to Virginia where she and the paternal aunts could help care for the baby.

After the incident, Desmond remained in Father's care. The social worker observed Father was well bonded with Desmond and attentive to the baby's needs. But Desmond appeared "'very tense'"—he "would cry in a high[-]pitched tone with an arched back and 'squirm' hysterically while being held" by Father or the social worker. According to the social worker, "Father was very patient and never appeared angered or frustrated" by Desmond's behavior. However, on July 17, 2019

---

[2] From September 21, 2017 to July 4, 2019 law enforcement came to the home 11 times in response to calls reporting that Mother had threatened to harm herself or others; on some of the occasions Mother had a weapon.

the Department obtained a removal order after learning Father had been diagnosed with schizoaffective disorder and had other mental health issues; he was not consistently taking his psychotropic medication; and he intended to continue residing in the home with Mother after her release from the hospital.

On July 22, 2019 the Department filed a dependency petition on behalf of then-two-month-old Desmond. The petition alleged Mother has "bipolar disorder, schizophrenia, severe depression, suicidal and homicidal ideations, paranoid thoughts and audio and visual hallucinations which renders [her] incapable of providing the child with regular care and supervision." Mother failed to take her psychotropic medication on a regular basis, and she was hospitalized on July 12, 2018 and July 4, 2019 for mental health treatment. Mother's older child C.P. was a prior dependent of the court and received permanent placement services due to Mother's mental health problems. Father failed to protect Desmond because he knew of Mother's mental health problems and allowed her to reside in the home with unlimited access to Desmond.

The petition also alleged Father was diagnosed with schizoaffective disorder, moderate post-traumatic-stress disorder, a slight developmental delay, and "psychoactiv[ity]."[3] Father failed to take psychotropic medication as prescribed. Father's mental and emotional problems rendered him incapable of

---

[3] Father's therapist explained Father's psychoactive diagnosis related to Father's alcohol use. According to the therapist, Father was in "'full remission'" because he did not currently use alcohol.

4

providing Desmond with regular care and supervision, endangered the child's physical health and safety, and placed Desmond at risk of serious physical harm.

At the July 23, 2019 detention hearing, the juvenile court detained Desmond from Mother and Father.[4] The court granted Mother monitored visits two times a week for one to two hours per visit. The court granted Father monitored visits three times a week for two hours each visit.

B.    *The First Amended Petition*

On August 14, 2019 Mother and Father arrived three and a half hours early for their visit with Desmond. Mother had a "'blank stare'" and signed in multiple times on different clipboards. The visitation monitor reported Mother "appeared very mad, flustered and frustrated." Mother flung a diaper bag across the room while trying to remove the pacifier attached to the bag. Mother later fed Desmond only half a bottle of formula even though it appeared he was still hungry and was crying for more. While Father was in the bathroom, Mother buckled Desmond in the car seat, placed the diaper bag on her shoulder and walked quickly towards the door with him. When the monitor asked Mother where she was going, Mother responded, "'Me and my baby are going home.'" The monitor called security, who came to assess the situation. The monitor reported that when Father walked back he was informed of what had

---

[4]    The juvenile court made an initial ICWA inquiry at the detention hearing. We discuss below the inquiry by the Department and the court.

5

transpired and became visibly upset, asking Mother "why would you do something so stupid?"

On September 6, 2019 the Department filed a first amended petition. Amended counts b-1 and j-1 alleged that on August 14 Mother "failed to take her psychotropic medication, [and] displayed aggressive and erratic behaviors. Consequently, the child's mother attempted to take the child during the monitored visit."

C. *The Jurisdiction and Disposition Hearing*

At the September 25, 2019 jurisdiction and disposition hearing, the juvenile court sustained the first amended petition under section 300, subdivisions (b)(1) and (j), declared Desmond a dependent of the court, and removed him from Mother's and Father's custody. The court ordered Mother and Father to participate in parenting classes for infants, a psychiatric evaluation (and a psychological assessment for Mother), mental health counseling, and weekly individual counseling with a licensed therapist. In addition, the court ordered the parents to take all prescribed psychotropic medications. The court also ordered Father to submit to alcohol testing. The court ordered the Department to provide family reunification services to Mother and Father.

The court denied visitation for Mother until she provided proof of enrollment in mental health services. The court reduced Father's visitation to weekly one-hour visits out of a concern for Desmond's emotional well-being in light of his crying uncontrollably whenever Father picked him up. However, the court indicated it would address the duration and frequency of the visits in the future.

6

D.    *Visitation During the Family Reunification Period*

During September 2019 Father had four monitored visits with Desmond.  While Desmond was "calm and alert before the visits," he immediately cried when Father "pick[ed] him up from his car seat."  Desmond would continue "crying for 45 minutes to up to an hour and 20 minutes straight until he [fell] asleep in [Father's] arms."  Father tried "to calm Desmond by rocking him in his arms, walking around the room, giving him a bottle, changing his diaper, [and] burping him."  Desmond only stopped crying when he drank formula, but once he finished the bottle, he would start crying again.  After the visits, Desmond would become "calm and quiet again."

Mother was hospitalized in late August and September to treat her mental health, and as a result she did not visit Desmond.  Mother was again hospitalized in October 2019 following a "horrific" multiple vehicle accident in which she broke her pelvic bone.  Mother's and Father's visits were postponed while Mother was in the hospital.  In November 2019 Mother and Father resumed monitored visits with Desmond.  The visitation monitor reported the November 12 "visit went surprisingly well."  Mother held Desmond for a few minutes then handed him back to Father.  Mother and Father "were fully engaged with" Desmond, and the child "responded well to [M]other and [F]ather."

On December 6, 2019 the juvenile court granted Mother monitored one-hour weekly visits and Father monitored two-hour twice weekly visits.  The social worker urged Father to visit Desmond twice a week, but Father continued to have a single one-hour visits with Mother present.

In March 2020 the Department reported Mother often held Desmond "for less than 5 minutes throughout the duration of the visit." During most visits, Desmond would cry "profusely while in [F]ather's care." Father "attempt[ed] to soothe [Desmond] by holding him, rocking him, and speaking gently." More recently, Father had been able to calm down Desmond.

During the COVID-19 pandemic, Mother and Father had video chats with Desmond in lieu of in-person visits. When in-person visits resumed in July 2020, Desmond "would cry for long periods of time" until he gradually adjusted to the visits. When Father visited Desmond without Mother, the two would play at the park. Father was "very cautious and patient" with Desmond and was "careful around anything that could be dangerous" for Desmond. Desmond "appear[ed] to be well bonded" with Mother and Father during visits. On September 23, 2020 the juvenile court found Mother and Father had made substantial progress in their case plans and ordered continued family reunification services.

Starting on November 13, 2020 Father began having a second one-hour visit with Desmond without Mother. Mother and Father arrived on time for their visits and were attentive toward Desmond. The monitor reported the visits were "going well" and Desmond was no longer crying around Father like he did during earlier visits. The following month the Department extended Mother's visits to two hours.

E.    *The 18-month Review Hearing*

At the March 9, 2021 18-month review hearing (§ 366.22), the juvenile court found Mother's progress had "been unsatisfactory towards alleviating or mitigating the causes

8

necessitating placement." Father had been visiting Desmond during the prior year and was "engaged in his case plan services, but he ha[d] not completed his case plan services that were ordered a year and a half ago." The court terminated Mother's and Father's family reunification services, explaining Desmond was only two months old when he was detained and the parents had been given 18 months of family reunifications services.

F.    *The Section 366.26 Report*

The June 15, 2021 section 366.26 report for the selection and implementation hearing stated two-year-old Desmond had been placed with his caregivers since he was two months old. The caregivers loved Desmond, treated him as their son, and wanted to adopt him. They were "able and willing to meet all of Desmond's needs," including regional center services and treatment of his Kawasaki's disease.[5] Desmond was "thriving" in their home. The caregivers were "the only family that Desmond has known," and he appeared "to very comfortable and attached to his caregivers."

Mother and Father continued to have weekly monitored visits with Desmond for two hours each visit. Mother and Father were "consistent with their visits and there [were] no reported concerns." The social worker observed during an April 2021 visit that the parents brought snacks and toys to the visit, and they

---

[5]    "Kawasaki disease" is "an acute inflammatory illness involving blood vessels throughout the body that is of unknown cause and chiefly affects infants and children." (See Merriam-Webster's Online Dict. (2022) <https://www.merriam-webster.com/dictionary/Kawasaki disease> [as of July 20, 2022], archived at https://perma.cc/H83X-RXJG.)

9

were attentive to Desmond. Desmond was happy to see Mother and Father.

G. *The Selection and Implementation Hearing*

At the June 30, 2021 selection and implementation hearing (§ 366.26), Father testified he and Mother had in-person visits every Thursday with Desmond. Father brought clothes, shoes, toys, and food to the visits for Desmond. Father changed Desmond's diaper, played with him, and made sure Desmond was safe and did not run from the visit site into traffic. Father taught Desmond "his colors, and his shapes, and how to count." Mother was in a wheelchair, but she was able to interact with Desmond during the visits. Mother and Father also had virtual visits by video for five to 20 minutes every day. Desmond called Father "Da-Da" and referred to Mother as his mother. Father objected to the adoption and asked the court "to give [him] a chance to be a good father."

Father's counsel requested the court find the beneficial parental relationship exception applied. She admitted Father only had monitored visits but noted Father had visited consistently, brought food, clothes, and toys to the visits, and played with Desmond. Further, Father "does act as a parent during these visits. . . . [Father] changes his diaper, and he teaches Desmond how to count, what his colors are, and what his shapes are. Additionally, Desmond . . . still does call [Father] da-da. . . . [Father] asserts he's occupied a parental role in Desmond['s] life." Mother's counsel argued the parents had "consistently visited" and "these visits are positive and the child does recognize his parents as his parents."

The Department's counsel acknowledged the parents had "consistent visitation" with Desmond, but she argued the beneficial parental relationship exception did not apply because "this visitation doesn't rise to the level of acting in a parental role, or creating a relationship that it would be detrimental to this child to sever this relationship." Minor's counsel joined with the Department to request the court terminate parental rights, arguing no exceptions applied.

The juvenile court found by clear and convincing evidence Desmond was adoptable and no exception to termination of parental rights applied. The court explained, "While the parents have maintained consistent visitation with the child, it has . . . not risen above the monitored status to even unmonitored. The parents have not occupied a parental role with the child. While the child may call and recognize the parents as the parents, I cannot find it would be a detriment to sever the relationship between the parents and the child." The court terminated parental rights and designated the caregivers as the prospective adoptive parents.

Mother and Father timely appealed.

## DISCUSSION

A. *The Beneficial Parental Relationship Exception*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination

11

of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), "the parent may avoid termination of parental rights" if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *In re B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'"

12

(*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317 (*Katherine J.*).) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, at p. 633; *Katherine J.*, at p. 317.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, at p. 630; accord, *In re B.D., supra*, 66 Cal.App.5th at p. 1225.)

B.  *The Juvenile Court Did Not Abuse Its Discretion in Finding the Beneficial Parental Relationship Exception Did Not Apply*

Mother and Father contend the juvenile court abused its discretion in finding the beneficial parental relationship exception did not apply because the court only considered whether the parents occupied a parental role, which is improper under *Caden C.*[6] The Supreme Court in *Caden C.* did not bar juvenile courts from considering whether a parent occupies a "parental role" in deciding whether the beneficial parental relationship exception applies; instead, the court explained that even where a parent continues to struggle with the problems that led to the dependency proceedings, the juvenile court's inquiry as

___

[6]    It is undisputed the parents had regular visits with Desmond.

13

to whether the beneficial parental relationship exception applies should focus on whether those challenges interfere with the parent's relationship with the child, whether the child has a substantial, positive emotional attachment to the parent, and whether loss of the relationship would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 642; see *In re D.M.* (2021) 71 Cal.App.5th 261, 271-272 [reversing order terminating parental rights following *Caden C.* where juvenile court improperly found father did not occupy parental role solely because he failed to attend his children's dental and medical appointments and to understand their medical needs]; *In re J.D.* (2020) 70 Cal.App.5th 833, 863-865, 870 [juvenile court improperly held beneficial parental relationship exception did not apply because mother's positive relationship with child "did not 'amount to a parental bond'" in light of mother's failure to meet child's daily needs]; *In re B.D., supra*, 66 Cal.App.5th at pp. 1229-1230 [reversing juvenile court's order terminating parental rights, and ordering new hearing in light of *Caden C.* to determine whether juvenile court's finding that parent did not serve in "parental role" was improperly based on parents' ability to provide for the children's daily needs and parents' sobriety].)

As the Court of Appeal recently explained in *Katherine J., supra*, 75 Cal.App.5th at page 309, "*Caden C.* prohibits juvenile courts from finding against a beneficial relationship *solely because* a parent has failed to surmount the issues that initially brought the child into dependency care—a standard that few parents facing termination of parental rights could hope to meet." (Accord, *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211-212 [reversing order terminating parental rights, and remanding for new section 366.26 hearing because "trial court's terse ruling"

14

that "the parents 'ha[d] not acted in a parental role in a long time'" could erroneously mean the parents "were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care"].) However, a finding the parent does not serve in a "'parental role'" in the child's life does not necessarily mean the juvenile court failed to consider the child's substantial, positive emotional attachment to the parent as required by *Caden C., supra*, 11 Cal.5th at page 636 and section 366.26, subdivision (c)(1)(B)(1). (*Katherine J.*, at pp. 309, 321-322 [affirming order terminating parental rights despite juvenile court's finding father had not served in parental role in child's life where father's unresolved issues prevented him from maintaining strong, positive attachment with child, thereby diminishing benefits to child from relationship].)

Although the juvenile court found Mother and Father had not "occupied a parental role" with Desmond, the court was responding to an argument by Father's counsel that Father "does act as a parent during these visits." It is troubling that the juvenile court did not explain what it meant by the parents occupying a "parental role," but any error in not clarifying its findings was harmless because Mother and Father failed to meet their burden to show Desmond developed a substantial, positive emotional attachment with them during the limited monitored visits each week, as a result of which Desmond would benefit from continuing the relationship. (*Caden C., supra*, 11 Cal.5th at p. 636; see *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 [harmless error standard applies in dependency cases]; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1128 [same].)

Desmond was only two months old when he was detained from Mother and Father and placed with his caregivers. During

the first year of visitation, Mother held Desmond for only a few minutes before handing him back to Father. And Desmond cried uncontrollably when Father held him, except when Desmond drank formula from his bottle or fell asleep in Father's arms. It was not until September 2020 that Father started having a second visit each week with Desmond, during which Father had more positive interactions with Desmond in the park (but without Mother). The social worker observed that at the weekly visits in 2020 Desmond "appear[ed] to be well bonded" with Mother and Father during the visits, but the record does not reflect any indicia of a bond other than that the parents were attentive to Desmond and brought snacks and toys to the visits.

In June 2021 the Department reported Mother and Father were "consistent with their visits and there were no reported concerns." Further, the social worker observed Desmond was happy to see Mother and Father. However, Father's testimony at the selection and implementation hearing did not address the emotional attachment Desmond had with the parents, instead focusing on the fact Father played with Desmond and taught him about colors, shapes, and how to count. The only other evidence of a relationship was that Desmond called Father "Da-Da" and referred to Mother as his mother. Thus, at most the evidence shows that by 2021 Mother and Father developed a bond with Desmond through their weekly monitored visits, but the parents failed to prove Desmond had "a substantial, positive, emotional attachment" with them. (*Caden C., supra*, 11 Cal.5th at p. 636; see *Katherine J., supra*, 75 Cal.App.5th at p. 317.)

Moreover, Mother and Father did not meet their burden to show it would be detrimental to Desmond to sever his relationship with the parents. Desmond's caregivers were "the

16

only family that Desmond has known," and they treated Desmond as their son. The caregivers were the prospective adoptive parents, and they were "able and willing to meet all of Desmond's needs" including regional center services and treatment of his Kawasaki's disease; and Desmond thrived in their care. The court did not abuse its discretion in impliedly finding the benefit and security provided by Desmond's continued placement with his prospective adoptive parents outweighed any harm that would be caused by the loss of his relationship with Mother and Father. (*Caden C., supra*, 11 Cal.5th at p. 634; *Katherine J., supra*, 75 Cal.App.5th at p. 317.)

C.    *The Juvenile Court and the Department Failed To Comply with ICWA and Related California Law*
      1.    *ICWA inquiry, notice, and findings*
At the detention hearing on July 23, 2019 Father filed a parental notification of Indian status form (ICWA-020), on which he checked the box stating, "I have no Indian ancestry as far as I know." Mother also filed a parental notification of Indian status form, on which she checked the box stating, "I may have Indian ancestry." Mother wrote her "[m]aternal side of family" might have "Blackfoot" ancestry, and she listed the names of maternal grandfather James P. and maternal cousin Ida A.

At the hearing, the juvenile court questioned Mother and maternal grandmother Yvette T. about the family's Indian ancestry. The court asked Yvette, "Can you tell me if you have any American Indian ancestry on your side of the family?" Yvette answered, "No." The court then asked, "So, if you daughter claimed on her ICWA-20 form, which is a form regarding parental notification of Indian status that she may have Indian

ancestry on the maternal side of the family and she claims, Blackfoot, would that be true?" Yvette responded, "I guess, yeah." The court responded, "Well, you just said 'no.'" Yvette replied, "I don't know if my family history, but her father['s] history—." The court interrupted, "I'm talking about your history, maternal side of the family." Yvette answered, "No." Yvette stated James was still alive but she did not have his phone number. Minor's counsel reported Yvette had provided him with the maternal uncle's phone number, explaining "we think he has a way to get ahold of the maternal grandfather." Yvette also told minor's counsel "she may have [James's] address at home."

The juvenile court asked Mother, "[D]o you have any information that on your father's side of the family there is any Blackfoot heritage?" Mother answered, "No." Mother stated she was told as a child by her maternal cousin (Ida) that "we have Blackfoot Indian ancestry." Yvette responded she did not "have any knowledge of it." Yvette informed the court she had a phone number for Ida, and she would try to obtain the most recent one.

The court ordered the Department to investigate Mother's claim of Blackfoot ancestry by contacting Ida and James, and "if they confirm Blackfoot heritage," to provide ICWA notice to the tribe.[7] The court did not inquire about the paternal family's

---

[7] "[T]here is frequently confusion between the Blackfeet tribe, which is federally recognized, and the related Blackfoot tribe, which is found in Canada and thus not entitled to notice of dependency proceedings. When Blackfoot heritage is claimed, part of the Agency's duty of inquiry is to clarify whether the parent is actually claiming Blackfoot or Blackfeet heritage so

18

possible Indian ancestry. The July 23, 2019 minute order stated, "The Court does not have a reason to know that ICWA applies to Father."

The court did not make any findings as to ICWA at the jurisdiction and disposition hearing. At the continued 18-month review hearing held on March 9, 2021 the Department submitted the IWCA notices (ICWA-030) the Department had previously sent to the Blackfeet Tribe of Montana, the Bureau of Indian Affairs, and the Secretary of the Interior on November 14, 2019. The notices stated Mother's, Father's, and maternal grandmother Yvette's birth date and birth place were "unknown." Further, the ICWA notices listed the paternal grandmother Priscila's current and former address and her birth date and place as "unknown." The ICWA notice did not provide any information about the maternal and paternal grandfathers, the maternal and paternal great-grandparents, or any other relatives.

On January 21, 2020 Mary R. Cooper, the ICWA Tech for the Blackfeet Tribe, sent a letter in response to the ICWA notice. Cooper wrote she was unable to find Desmond listed on the tribal rolls and he was not eligible for enrollment because "our blood quantum requirement for enrollment is 1/4 Blackfeet blood." Cooper added, "If you are able to gather more information on the ancestry of the parents, please contact me again and I will review the tribal rolls."

On February 4, 2021 a social worker emailed Cooper to inquire about James and Ida, and whether Desmond was an Indian child. Cooper responded that if neither Mother nor Father

---

that it can discharge its additional duty to notice the relevant tribes." (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

19

was registered as a Blackfeet tribe member, then Desmond was not a member of the tribe.  At the March 9, 2021 18-month review hearing, the juvenile court found it did not have reason to know Desmond was an Indian child, and ICWA did not apply.

### 2. *ICWA inquiry and notice requirements*

ICWA provides as to dependency proceedings, "[W]here the court knows or has reason to know that an Indian child is involved, the party seeking . . . termination of parental rights to . . . an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention."  (25 U.S.C. § 1912(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 5*; In re Antonio R.* (2022) 76 Cal.App.5th 421, 428 (*Antonio R.*); *In re T.G.* (2020) 58 Cal.App.5th 275, 288.)  California law also requires notice to the Indian tribe and the parent, legal guardian, or Indian custodian if the court or the Department "knows or has reason to know" the proceeding concerns an Indian child.  (§ 224.3, subd. (a); see *Antonio R.*, at p. 429; *In re T.G.*, at p. 288; Cal. Rules of Court, rule 5.481(c)(1) [notice is required "[i]f it is known or there is reason to know an Indian child is involved in a proceeding listed in rule 5.480," which includes dependency cases filed under section 300].)  The notice requirement is at the heart of ICWA because it "enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding."  (*In re Isaiah W.*, at p. 5; accord, *Antonio R.*, at p. 428; *In re T.G.*, at p. 288; see 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3, subd. (d).)

20

The juvenile court and the Department "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child."  (§ 224.2, subd. (a); see *In re Isaiah W., supra*, 1 Cal.5th at p. 9; *In re H.V.* (2022) Cal.App.5th 433, 437 ["The trial court and [Department] have an affirmative and continuing duty in every dependency proceeding to determine whether ICWA applies."].)  "The continuing duty to inquire whether a child is or may be an Indian child 'can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'"  (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552; accord, *In re H.V.*, at p. 437; *In re Josiah T.* (2021) 71 Cal.App.5th 388, 402.)

"The duty to inquire begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child.  (§ 224.2, subds. (a)-(c))."  (*In re T.G., supra*, 58 Cal.App.5th at p. 290; accord, *In re J.C.* (2022) 77 Cal.App.5th 70, 77; *In re H.V., supra*, 75 Cal.App.5th at p. 437 ["[F]rom the [Department]'s initial contact with a minor and his family, [section 224.2] imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child."].)

Section 224.2, subdivision (b), effective January 1, 2019, imposes on the Department a duty to inquire whether a child in the Department's temporary custody is an Indian child, which "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ."  (*Id*.; see Cal. Rules of Court,

21

rule 5.481(a)(1) [the Department "must ask . . . extended family members . . . whether the child is or may be an Indian child"]; *In re D.F.* (2020) 55 Cal.App.5th 558, 566; *In re Y.W., supra*, 70 Cal.App.5th at pp. 551-552.)  Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent."  (25 U.S.C. § 1903(2); see Welf. & Inst. Code, § 224.1, subd. (c) ["As used in connection with an Indian child custody proceeding, the terms 'extended family member' and 'parent' shall be defined as provided in Section 1903 of the federal Indian Child Welfare Act."].)

"State law also expressly requires the juvenile court to ask participants who appear before the court about the child's potential Indian status.  (§ 224.2, subd. (c).)"  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742; accord, *In re Josiah T., supra*, 71 Cal.App.5th at p. 402.)  Similarly, under federal regulations, "[s]tate courts must ask each participant in an . . . involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child."  (25 C.F.R. § 23.107(a) (2022).)  "The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families."  (*Antonio R., supra*, 76 Cal.App.5th at p. 430; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["The court and the agency must act upon information received from any source, not just the parent [citations], and the parent's failure to object in the juvenile court to deficiencies in the investigation or noticing does

22

not preclude the parent from raising the issue for the first time on appeal . . . ."].)

"[I]f the court or child protective agency 'has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child,' the court and the Department 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'" (*In re J.C., supra*, 77 Cal.App.5th at p. 78, quoting § 224.2, subd. (e); see *In re H.V., supra*, 75 Cal.App.5th at p. 437; *In re T.G., supra*, 58 Cal.App.5th at p. 290; Cal. Rules of Court, rule 5.481(a)(4).)

> 3. *The juvenile court failed to ensure the Department satisfied its duty of inquiry*

Mother and Father contend the Department should have inquired of the paternal extended family members under section 224.2, subdivision (b), including the paternal grandmother, regarding Desmond's possible Indian ancestry. The parents also argue the Department failed to make a sufficient further inquiry of the maternal relatives under section 224.2, subdivision (e), based on Mother's statement that she might have "Blackfoot ancestry" on the maternal side of the family. The Department does not argue it complied with ICWA, instead stating it "submits on the ICWA issue." We agree with Mother and Father that the Department and the juvenile court failed to comply with their inquiry and notice obligations under ICWA and California law.

Notwithstanding Father's denial of Indian ancestry, section 224.2, subdivision (b), obligates the Department to

23

inquire of Desmond's extended family members as to the child's possible ancestry. (*Antonio R., supra*, 76 Cal.App.5th at p. 431 ["By requiring the Department to inquire of a child's extended family members as to the child's possible Indian ancestry, the Legislature determined that inquiry of the parents alone is not sufficient."]; see *In re Y.W., supra*, 70 Cal.App.5th at p. 556 ["the point of the statutory requirement that the social worker ask all relevant individuals whether a child is or may be an Indian child" is "to obtain information the parent may not have"].) Information relevant to Desmond's possible Indian ancestry was readily obtainable from paternal grandmother, who was interviewed by a social worker at the outset of the case on July 8, 2019, and again on November 17, 2020 as a possible relative placement. Moreover, the social worker never contacted the paternal aunts in Virginia to inquire about Desmond's possible Indian ancestry.

The Department also failed to conduct a further inquiry into Desmond's possible Blackfeet Indian ancestry on the maternal side of the family. Although Mother identified James and Ida as sources of information, the Department made no effort to contact them. At the detention hearing, Yvette stated she had a phone number for Ida and may have James's address at home. Yvette also provided minor's counsel with the maternal uncle's phone number and indicated the uncle had James's contact information. The juvenile court ordered the Department to investigate Mother's claim of Blackfeet ancestry by contacting James and Ida, but the Department never contacted either one or requested contact information from Yvette or the maternal uncle. Thus, although the court and the Department had "reason to believe the child is an Indian child," the Department failed to

make further inquiry as required under section 224.2, subdivision (e).

The juvenile court erred in finding IWCA did not apply because the Department failed to satisfy its duty of inquiry under section 224.2, subdivisions (b) and (e), and the court failed to ensure the Department complied with the inquiry obligations. (*In re J.C., supra*, 77 Cal.App.5th at p. 74 ["the court's finding ICWA did not apply" was not supported by substantial evidence where the court "failed to ensure the Department fulfilled its duty of inquiry under section 224.2, subdivision (b)"]; *Antonio R., supra*, 76 Cal.App.5th at p. 432 [court's finding ICWA did not apply was erroneous where Department failed to inquire of child's extended family members about possible Indian ancestry, and court failed to ensure Department satisfied its duty of initial inquiry].)[8]

4.    *The Department did not give proper notice to the Blackfeet Tribe*

The Department also failed to send a complete ICWA notice to the Blackfeet Tribe.  The ICWA notice omitted Mother's, Father's, and Yvette's date and place of birth, and the paternal grandmother's current and former addresses and date and place of birth.  Moreover, the notice did not provide any information

---

[8]    The Department does not argue the error was harmless, noting only that some Courts of Appeal have deemed similar ICWA inquiry errors to be harmless, but this court has held otherwise.  The error here in not inquiring of any paternal relatives and failing to inquire of any maternal relatives beyond the maternal grandmother was not harmless.

25

about the maternal and paternal grandfathers, the maternal and paternal great-grandparents, or any other relatives.

This essential background information was required by the federal regulation and related California law. "Federal regulations implementing ICWA provide that the notice must include, in addition to information about the child and the child's parents, "[i]f known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents."" (*In re Y.W., supra,* 70 Cal.App.5th at pp. 556-557; accord, *In re E.H.* (2018) 26 Cal.App.5th 1058, 1069; see 25 C.F.R. §§ 23.11(a) & 23.111(d)(1)-(3) (2022).) Further, "[s]ection 224.3, subdivision (a)(5)(C), requires ICWA notices to include '[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known.'" (*In re Y.W.,* at p. 557; see *In re T.G., supra,* 58 Cal.App.5th at p. 294, fn. 18.)

"'ICWA notice requirements are strictly construed' [citation] and '"must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.""" (*In re Y.W., supra,* 70 Cal.App.5th at pp. 556-557; accord, *In re J.S.* (2021) 62 Cal.App.5th 678, 688.) ""[O]rdinarily failure in the juvenile court to secure compliance with [ICWA's] notice provisions is prejudicial error." [Citations.] Any failure to comply with a higher state standard, however, "must be held harmless unless

26

the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error.""'" (*In re Y.W.*, at p. 558; accord, *In re E.H., supra,* 26 Cal.App.5th at p. 1072.)

Here, the incomplete ICWA notice fails to comply with federal regulations and state law. (See *In re* Y.W.*, supra,* 70 Cal.App.5th at pp. 558 [notices to tribes, which omitted paternal great-grandmother's place of birth, and date and place of death, violated both federal regulations and state law]; *In re Breanna S.* (2017) 8 Cal.App.5th 636, 654 ["the Department violated the requirements of both federal and state law regarding the content of an ICWA notice" by omitting information pertaining to maternal great-grandmother, her husband, and daughter], disapproved on other grounds in *Caden C., supra,* 11 Cal.5th at pp. 637, fn. 6 & 638, fn. 7.)

Although Cooper concluded Desmond was neither listed on the tribal rolls nor eligible for enrollment, her determination was based on incomplete information in the ICWA notice. Cooper informed the Department that she would "review the tribal rolls" again if the Department was "able to gather more information on the ancestry of the parents." There is no evidence the Department provided any additional information even though the social workers were in contact with Mother, Father, and both grandmothers. Moreover, Cooper's statement that either Mother or Father had to be a registered tribe member for Desmond to be a member does not mean the errors in the ICWA notice were harmless. Any search by Cooper for Mother's and Father's names in the Blackfeet tribal rolls was necessarily limited because the ICWA notice failed to include Mother's and Father's date and place of birth. The ICWA notice's omission of essential

27

background information pertaining to Desmond's maternal and paternal relatives was therefore prejudicial error. (*In re Y.W., supra*, 70 Cal.App.5th at p. 558 ["We cannot say the Cherokee tribes would have made the same determination [the children] were not Indian children had the Department fulfilled its obligations under ICWA and related California law and mailed notices with more complete information."]; *In re E.H., supra*, 26 Cal.App.5th at p. 1074 [social service agency's failure to comply with ICWA and related California law was prejudicial error because "the Agency's failure to include accurate information about [maternal grandmother's] father in its ICWA Notice may have altered the tribe's determination as to whether E.H. was an Indian child."]; *In re Breanna S., supra*, 8 Cal.App.5th at p. 655 ["[O]nce ICWA notice is required, . . . we would be extremely reluctant under most circumstances to foreclose the tribe's prerogative to evaluate a child's membership rights without it first being provided all available information mandated by ICWA."])

## DISPOSITION

The order terminating Mother's and Father's parental rights is conditionally affirmed. We remand to the juvenile court for the Department and the court to comply with the inquiry and notice provisions of ICWA and related California law, including inquiry of the maternal grandparents, the maternal uncle, maternal cousin Ida, the paternal grandmother, the paternal aunts, and any other reasonably available extended family members; to follow up on any information the Department may obtain about Desmond's possible Indian ancestry; and to send a

28

new ICWA notice to the Blackfeet Tribe that includes complete biographical information for Mother, Father, the maternal and paternal grandparents, maternal and paternal great-grandparents, and maternal cousin Ida. If the court finds Desmond is an Indian child, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in compliance with ICWA and related California law. If not, the court's original section 366.26 orders will remain in effect.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.